J-S41032-15

2015 PA Super 178

| | |
|---|---|
| MEGAN I. SHINAL AND ROBERT J. SHINAL, HER HUSBAND,<br><br>Appellants<br><br>v.<br><br>STEVEN A. TOMS, M.D.,<br><br>Appellee | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br><br>No. 1714 MDA 2014 |

Appeal from the Judgment Entered September 29, 2014
in the Court of Common Pleas of Montour County
Civil Division at No.: 588-CV-2009

BEFORE: ALLEN, J., LAZARUS, J., and PLATT, J.[*]

OPINION BY PLATT, J.: **FILED AUGUST 25, 2015**

In this medical malpractice case, Appellants, Megan I. Shinal,[1] and

Robert J. Shinal, her husband, appeal from the judgment entered in favor of

Appellee, Steven A. Toms, M.D., following a jury's defense verdict of no

liability on the issue of informed consent. Appellants challenge the denial of

their motions to strike certain prospective jurors for cause. They also object

to a jury instruction on information provided by Appellee's support staff to

determine informed consent, and the denial of their motion *in limine* to

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that Mrs. Shinal's middle initial is alternatively given as "L" and "I" by Appellants in the record.

preclude reference to the consent form Mrs. Shinal signed. Appellants assert that they are entitled to a new trial. We affirm.

We derive the facts of the case from the trial court opinion and our independent review of the record. This suit arises out of a January 2008 brain surgery to resect (cut out or remove) a craniopharyngioma from Mrs. Shinal which recurred after a prior removal by another surgeon in 2004. A craniopharyngioma is a generally benign (non-cancerous) brain tumor that develops at the base of the brain near the pituitary gland.[2] The issue at trial, and the overarching issue on appeal, is whether Dr. Toms obtained Mrs. Shinal's informed consent for the surgery to remove the recurring brain tumor. In the original complaint, Appellants named Geisinger Medical Center and Geisinger Clinic as additional defendants to Appellee, Dr. Toms.

Appellants had an initial consultation with Appellee on November 26, 2007. It took about twenty minutes. Dr. Toms testified that he remembered having a conversation with Mrs. Shinal at that first meeting,

---

[2] The pituitary gland is a pea-sized organ that lies at the base of the brain above the back of the nose. *See* NCI Dictionary of Cancer Terms, National Institutes of Health, *USA.gov*. Craniopharyngioma can increase pressure on the brain, usually from hydrocephalus (buildup of fluid inside the skull that leads to brain swelling); disrupting hormone production by the pituitary gland; and decreasing vision due to pressure or damage to the optic nerve. Increased pressure on the brain causes headache, nausea, vomiting, and difficulty with balance. *See* MedlinePlus, (*http://medlineplus.gov/*), U.S. National Library of Medicine, National Institutes of Health, U.S. Department of Health and Human Services.

about her goals and expectations in life, as well as the risks of surgery, including possible damage to the nearby carotid arteries and the optic nerve. (**See** N.T. Trial, 4/17/14, at 94-95).

In particular, he recalled that because Mrs. Shinal said she wanted to be there for her child, then nine, he took her to mean that "she wanted me to push forward if I got in a situation where I thought I could do it [remove all of the tumor] with a reasonable risk." (**Id.** at 96).

He explained that a less aggressive approach to tumor removal was safer in the short term by reducing the risk of damage to structures near the tumor. But he also testified that a less aggressive approach increased the risk of reducing survival rates, about 25%, by increasing the possibility of leaving behind some remnants of the tumor, which could grow back. Therefore, in his judgment, more aggressive surgery was more beneficial in the long-term. (**See id.** at 102-03).

At trial, Mrs. Shinal disputed receiving much of this information. She essentially denied any recollection that she had been informed of the relative risks of fatality or other possible complications of her surgery. (**See** N.T. Trial, 4/16/14, at 132-35). She did testify that Dr. Toms told her the risks of this surgery were "coma and death." (**Id.** at 155). Mrs. Shinal testified that, given an option, she would have taken the safer, less aggressive, rather than a more aggressive surgery. (**See id.** at 152-53).

Mrs. Shinal did not dispute that she had two meetings with Dr. Toms, although she could not remember the date of the second meeting. After the initial consultation with Dr. Toms, Mrs. Shinal also had one or more follow-up discussions by telephone with a physician's assistant of Dr. Toms.

She asked about the date of the surgery, what kind of scar she would have, and whether radiation would be necessary after surgery. Mrs. Shinal's first surgery had been transsphenoidal, which accesses tumors in or near the pituitary gland by entering through the nasal passage and the sphenoid sinus (a hollow space in a bone in the nose). She was unsure whether the surgery would again be transsphenoidal or a craniotomy (through the skull), and asked about that. (**See id.** at 139).

On February 12, 2013, the trial court attempted unsuccessfully to empanel a jury. It could not do so. Too many prospective jurors were dismissed because they were employed or insured by Geisinger entities. The court continued the trial.

Three months later, on May 28, 2013, as noted in the trial court opinion, the court granted partial summary judgment in favor of both Geisinger defendants, Geisinger Medical Center and Geisinger Clinic, on the ground that the duty to obtain informed consent was personal to Dr. Toms. **See Valles v. Albert Einstein Med. Ctr.**, 805 A.2d 1232, 1239 (Pa. 2002) ("Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed

consent so as to render the facility vicariously liable."). At that point, Appellee Toms was the only remaining defendant.

On April 15, 2014, the trial court began a second round of jury selection. In *voir dire*, the trial court endeavored to implement what it perceived to be the principles enunciated in ***Cordes v. Assocs. of Internal Med.***, 87 A.3d 829, 833-34 (Pa. Super. 2014) (*en banc*) (plurality opinion), *appeal denied*, 102 A.3d 986 (Pa. 2014).[3]  (***See*** Opinion and Order, 9/12/14, at 3).

As part of this procedure, Appellants' counsel were permitted to inquire whether each prospective juror was an employee of any Geisinger affiliate, or if a relative was employed by a Geisinger affiliate, and whether they "perceive[d]" themselves to be employed by the same company as Dr. Toms. (N.T. Jury Selection, 4/15/14, at 66).  If so, they were asked if they

---

[3] No single opinion in ***Cordes*** commanded a majority of the *en banc* panel. As discussed in more detail below, Judge Wecht's opinion in support of reversal, joined by P.J.E. Bender, held that the clinical (doctor-patient) relationships between prospective jurors (or their family members) and the defendant-physician were sufficiently close to warrant a finding of *per se* prejudice.  Reasoning further that the mere appearance of partiality of a juror **may** suffice to undermine confidence in the outcome of the trial, he also decided that a prospective juror's employment relationship with an entity related to the employer of the physician-defendant such that a plaintiff's verdict would have an adverse financial impact on his employer was a "relationship that resembles the close financial or situational relationships that courts have found create the prospect or appearance of partiality".  ***Cordes***, ***supra*** at 843; ***see generally***, ***id.*** at 842-46.

believed or perceived that a verdict against Dr. Toms would have a negative financial impact on their employer. (*See id.* at 66-67). Some, like Linda Woll, replied that Geisinger was too big to be adversely affected by a single judgment, but that in any event, such occurrences were probably covered by malpractice insurance. (*See id.*).

Most were also asked if they, or a relative, had ever been treated as a patient at Geisinger, and, if so, whether they received a favorable result. Finally, all were asked, many in the context of the answers they had previously given to these questions, whether they could render a fair and impartial verdict. As noted by the trial court, all said they could. (*See* Trial Court Opinion, 9/12/14, at 3).

The four prospective jurors at issue in the first claim of this appeal are Linda Woll, Denny Ackley, Louise Schiffino and Stephen Nagle.

Ms. Woll was an administrative secretary at the Geisinger sleep labs. (*See* N.T. Jury Selection, 4/15/14, at 66). Before *voir dire*, Ms. Woll had never heard of Dr. Toms. (*See id.*). She volunteered that she had "nothing to do with med surge." (*Id.*). She did not believe a verdict against Dr. Toms would negatively affect her employer. ("Probably not."). (*Id.* at 67). She noted the large size and local dominance of Geisinger, as well as the existence of malpractice insurance. (*See id.*).

Mr. Ackley's wife worked for thirty-five years as an administrative assistant in the Geisinger pediatrics department. Mr. Ackley had never heard of Dr. Toms. (**See id.** at 70).

Ms. Schiffino was a customer service representative for Geisinger Health Plan. She had never heard of Dr. Toms. (**See id.** at 91-92).

Mr. Nagle was a retired physician's assistant who had previously worked at Geisinger but in different departments than Appellee Toms (specifically, plastic surgery and gastro-intestinal); his son worked as a night security officer at Geisinger. Mr. Nagle knew of Dr. Toms, but had never actually met him. (**See id.** at 129). Mr. Nagle doubted that a plaintiffs' verdict would have a particular negative financial impact on Geisinger, other than adverse publicity. (**See id.** at 130-31).

Therefore, none of these four knew Appellee Toms personally, had ever worked with him, or been treated by him as a patient. The trial court denied Appellants' motions to dismiss Woll, Ackley, Schiffino and Nagle for cause. Appellants exercised their four peremptories and excluded them from the jury.[4] (**See id.** at 191-92).

Appellants filed a motion *in limine* to preclude reference at trial to the surgical consent form that Mrs. Shinal signed, which the trial court denied.

_____

[4] We omit reference and discussion of all venire persons who were seated as jurors without objection, or who were dismissed for cause after testifying to an employment, patient or other relationship with Geisinger.

The court also denied Appellants' motion for a change of venue. At trial, Mrs. Shinal conceded that on January 17, 2008, she had signed the consent form, which bore her signature, but denied that she had been informed of all the risks, benefits, options, and alternatives to surgery. (*See* N.T. Trial, 4/16/14, at 149-155).

The trial court summarizes additional pertinent facts as follows:

On January 31, 2008, [Appellant Mrs. Shinal] underwent an open craniotomy to resect a recurrent craniopharyngioma, a non-malignant brain tumor. During the operation, [Appellee] perforated the carotid artery, and [Mrs. Shinal] was left with impaired vision and ambulation. [Appellee's] employer, Geisinger Clinic, and an affiliate hospital, Geisinger Medical Center, were dismissed as defendants on a pretrial Motion for Partial Summary Judgment, in that the only theory on which [Appellants] were proceeding was based upon a lack of informed consent, and that theory was found to rest upon a duty of [Appellee]/physician and not of the Geisinger entities or its agents other than [Appellee].

At *voir dire* on April 15, 2014, [Appellants] sought a *per se* disqualification of all prospective jurors who worked at a Geisinger affiliate, or who had close family who worked at a Geisinger affiliate. The [c]ourt conducted an in depth individual examination of all prospective jurors, covering points including whether the jurors or close family (1) knew, or had been patients of, [Appellee]; (2) were employed by a Geisinger entity; (3) if employment by a Geisinger entity existed, whether the prospective juror perceived that entity to be the same entity employing [Appellee]; and (4) whether the prospective juror perceived that a verdict adverse to [Appellee] would adversely financially impact the Geisinger entity which employed the prospective juror or a member of his or her family. . . . The four jurors as to whom [Appellants] object[ ] (Nagel, Schiffino, Woll and Ackley) all confirmed that they felt that they would be able to be fair and impartial, that they did not personally know [Appellee], and that [Appellee] did not medically treat the prospective jurors or any of their close family members. All four jurors at issue were employed by a Geisinger affiliate or had

- 8 -

close family employed by a Geisinger affiliate. Most importantly, all four prospective jurors stated that they did not believe that a verdict against [Appellee] would negatively financially impact the employer of the prospective jurors or their close family members.

At trial, [Appellants] objected to [Appellee's] introduction of a form ([ ] the "Informed Consent Form") signed by [Mrs. Shinal] on January 17, 2008 in which the following was stated:

I give my permission to Dr. Toms . . . to perform [a] resection of recurrent craniopharyngioma. I have discussed the procedure to be performed with my physician who has informed me of the risks and consequences associated with the procedure. Those risks include but are not limited to pain, scarring, bleeding, infection, breathing problems, heart attack, stroke, injury and death.

I have discussed the **advantages and disadvantages of alternative treatments**. . . .

**This form has been fully explained to me and I understand its contents. I had the opportunity to ask questions and I am completely satisfied with the answers. I have sufficient information to give my informed consent to the operation or special procedure.**

(Emphasis in original). [Appellants assert] that the facts of [Mrs. Shinal's] signature of the Informed Consent Form and its contents were irrelevant. At trial, [Appellee] testified at length regarding his habit in explaining his use of the form at issue.

During trial, the fact was brought out that, between [Mrs. Shinal's] initial consultation with [Appellee] on November 26, 2007 and the surgery on January 31, 2008, [Mrs. Shinal] spoke with Physician's Assistant Shah ("PA Shah") and was provided information relating to the cranial incision to be made and the likelihood of scarring.

(Trial Court Opinion, 9/12/14, at 2-4).

Appellants also objected to a jury instruction proposed by Appellee which charged the jury that any qualified assistants of Dr. Toms could convey information to Appellant Megan Shinal as part of the informed consent process. The trial court gave the instruction. During deliberations, the jury inquired about whether physician's assistants could convey information for informed consent. The trial court essentially repeated the previously given instruction. (*See id.* at 10).

The jury returned a defense verdict of informed consent.[5] Appellants filed a post-verdict motion seeking a new trial.[6] The trial court denied Appellants' motion following argument on August 29, 2014. This timely appeal on October 9, 2014, followed the entry of judgment on September 29, 2014.

Appellants raise four questions on appeal:

---

[5] Specifically, the jury answered "No" to the following question:

> [D]o you find that the Defendant Steven A. Toms, M.D. failed to give the Plaintiff Megan L. Shinal a description of the surgery which was conducted or of the risks and viable alternatives to that surgery that a reasonably prudent patient would require to make an informed decision as to that surgery?

(N.T. Trial, 4/21/14, at 247).

[6] Counsel for Appellants also requested judgment notwithstanding the verdict (JNOV), but abandoned that request at oral argument. (*See* N.T. Argument, 8/29/14, at 32). Following appeal, Appellants filed a court-ordered statement of errors on November 13, 2014. *See* Pa.R.A.P. 1925(b). On December 4, 2014, the trial court filed a Rule 1925(a) opinion, referencing its opinion filed September 12, 2014. *See* Pa.R.A.P. 1925(a).

(a) Whether MEGAN L. SHINAL and ROBERT J. SHINAL, her husband, are entitled to a new trial because the trial court committed reversible error by denying [Appellants'] Motions to Strike for Cause Jurors with close familial, situational and/or financial relationships to [Appellee], Steven A. Toms, M.D., Geisinger Medical Center, Geisinger Clinic, Geisinger Health System or any Geisinger Affiliated Entity during jury selection on April 15, 2014?

(b) Whether MEGAN L. SHINAL and ROBERT J. SHINAL, her husband, are entitled to a new trial because the trial court committed reversible error by charging the jury with the same erroneous instruction on two separate occasions that [Appellee's] "qualified staff," who were non-physicians, can obtain the informed consent of the patient, MEGAN L. SHINAL, for surgery?

(c) Whether MEGAN L. SHINAL and ROBERT J. SHINAL, her husband, are entitled to a new trial because the trial court committed reversible error by denying their [m]otion in [l]imine to [p]reclude [Appellee] from any mention, testimony and/or reference to the "standard" surgical consent form signed by MEGAN SHINAL, relative to the January 31, 2008, surgery when MEGAN SHINAL'S consent to surgery was not at issue in this matter?

(d) Whether the trial court committed an error of law and/or abused its discretion in denying [Appellants'] Motion for Post Trial Relief?

(Appellants' Brief, at 6)[7] (capitalization in original; some capitalization omitted).

The sole duty of an appellate court upon an appeal from the trial court's denial of a motion for judgment n.o.v. or a new trial is to decide whether there was sufficient competent

---

[7] We observe that although Appellants' sixty page brief is twice the length of a presumptively compliant (thirty page) brief, they have failed to certify compliance with the 14,000 word limit prescribed in the Pennsylvania Rules of Appellate Procedure. *See* Pa.R.A.P. 2135(a)(1).

- 11 -

evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference to be drawn from such evidence.

*Sanderson v. Frank S. Bryan, M.D., Ltd.*, 594 A.2d 353, 354 (Pa. Super. 1991) (citation omitted).

The Medical Care Availability and Reduction of Error (MCARE) Act defines informed consent in relevant part as follows:

> **(a) Duty of physicians.**—Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> *    *    *
>
> **(b) Description of procedure.**—Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted medical standards of medical practice would provide.
>
> *    *    *
>
> **(d) Liability.**—
>
> (1) A physician is liable for failure to obtain the informed consent only if the patient proves that receiving such information would have been a substantial factor in the patient's decision whether to undergo a procedure set forth in subsection (a).
>
> (2) A physician may be held liable for failure to seek a patient's informed consent if the physician knowingly misrepresents to the patient his or her professional credentials, training or experience.

40 Pa.C.S.A. § 1303.504.

> Appellant correctly asserts that the established law of our Commonwealth considers a claim for a lack of informed consent to be a technical battery, and that negligence principles do not apply to this claim. ***See: Montgomery v. Bazaz–Sehgal***, 568 Pa. 574, 585–586, 798 A.2d 742, 749 (2002). . . . Thus, at its core, this action required a showing that appellees failed to conform to a specific acceptable professional standard, namely "[to] provide patients with material information necessary to determine whether to proceed with the surgical or operative procedure, or to remain in the present condition." ***Valles v. Albert Einstein Medical Center***, 569 Pa. 542, 551, 805 A.2d 1232, 1237 (2002) (internal quotations and citations omitted). At a minimum, appellant was obliged to demonstrate that appellees had failed to disclose such information as would impart to her a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results.

***Pollock v. Feinstein***, 917 A.2d 875, 878 (Pa. Super. 2007) (some citations and internal quotation marks omitted).

Here, Appellants first challenge the denial of their motion to strike prospective jurors Woll, Ackley, Schiffino and Nagle for cause on the ground that they had close relationships to Appellee Toms, or a Geisinger affiliate. (***See*** Appellants' Brief, at 6)). They argue that because they were forced to use four peremptory strikes they were "unable to strike other jurors, who were presumably biased (sic) and impartial." (***Id.*** at 17). They contend that the trial court should have presumed prejudice. (***See id.*** at 20-21). We disagree.

> Our standard of review of a court's decision not to strike a potential juror for cause is well-settled:

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice[,] or demonstrates a likelihood of prejudice by his or her conduct and answers to questions. Our standard of review of a denial of a challenge for cause differs, depending upon which of these two situations is presented. In the first situation, in which a juror has a close relationship with a participant in the case, the determination is **practically one of law and as such is subject to ordinary review.** In the second situation, when a juror demonstrates a likelihood of prejudice by conduct or answers to questions, much depends upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in the case of palpable error. When presented with a situation in which a juror has a close relationship with participants in the litigation, we presume prejudice for the purpose of [en]suring fairness.

*McHugh v. P[rocter] & G[amble] Paper Prods. Co.*, 776 A.2d 266, 270 (Pa. Super. 2001) (footnote, citations, internal quotation marks, and original modifications omitted).

This Court previously has described this inquiry in general terms as follows:

[T]here are two types of situations in which challenges for cause should be granted: (1) when the potential juror has such a close relationship, be it familial, financial or situational, with parties, counsel, victims, or witnesses, that the court will presume the likelihood of prejudice; and (2) when the potential juror's likelihood of prejudice is exhibited by his conduct and answers to questions at voir dire. **In the former situation, the determination is practically one of law and as such is subject to ordinary review.** In the latter situation, much depends

- 14 -

upon the answers and demeanor of the potential juror as observed by the trial judge and therefore reversal is appropriate only in case of palpable error.

**Commonwealth v. Colon**, [ ] 299 A.2d 326, 327–28 ([Pa. Super.] 1972).

**Cordes**, **supra** at 833-34 (emphases added).

Preliminarily, here, we note that even though Appellants frame their first question in the alternative, they fail to develop an argument, and reference no evidence to support the claim, that any direct relationship existed between Dr. Toms and any of the prospective jurors. Therefore, the only substantive claim for review is that the prospective jurors should have been stricken because of an **indirect** relationship, through Geisinger.

Here, Appellants rely principally on **Cordes** for the argument in their brief. (**See** Appellants' Brief, at 19-22, 24, 28-30, 33, 35). They relied exclusively on **Cordes** at jury selection. (**See** N.T. Jury Selection, 4/15/14, at 190-91). Additionally, it bears noting that the trial court, in conducting *voir dire*, as well as in the reasoning of its opinion, endeavored to "synthesiz[e]" what it perceived to be analogous principles of law from **Cordes**, **supra**. (Trial Ct. Op., 9/12/14, at 3).

However, **Cordes** is a plurality opinion. **See Cordes**, **supra** at 847.[8] A plurality opinion is not binding precedent. **See Commonwealth v.**

_____

[8] Only one judge joined Judge Wecht's opinion in support of reversal without reservation (P.J.E. Bender). President Judge Gantman and Judge Bowes

*(Footnote Continued Next Page)*

- 15 -

***Albert***, 767 A.2d 549, 554 n.3 (Pa. Super. 2001). ***Cordes*** is not controlling authority.

Furthermore, while a majority of the *en banc* panel concurred in the result in ***Cordes***, the judges did not agree on the reason for the result. Accordingly, the rationale for the result is not binding precedent.[9] Our Supreme Court has explained:

> While the ultimate order of a plurality opinion; *i.e.* an affirmance or reversal, is binding on the parties in that particular case, **legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority.** Indeed, an order may be deemed a "conclusion," but the conclusion to which we refer in this opinion is not the order of the plurality, but the specific legal conclusion espoused by the plurality.

***In Interest of O.A.***, 717 A.2d 490, 495-96 n.4 (Pa. 1998) (emphasis added).

---
*(Footnote Continued)* ————————————

concurred in the result. Judge Donohue filed an opinion in support of reversal which, however, disagreed with the rationale of Judge Wecht's opinion. President Judge Gantman and Judge Ott joined Judge Donohue's opinion. Judge Olson filed a dissenting opinion in which Judge Allen joined. Former President Judge Stevens (later Justice Stevens), although originally listed on the panel, did not participate in the consideration or decision of the case. ***See Cordes***, ***supra*** at 847.

[9] Among other problems unresolved in ***Cordes***, the opinion in support of reversal exercises a *de novo* standard and plenary scope of review on the ground that review of the question of "close relationship" is "practically one of law and as such is subject to ordinary review," citing ***McHugh*** and ***Colon***. ***Cordes***, ***supra*** at 834. However, as ***McHugh*** explains, "[o]rdinary review by an appellate court consists of determining whether the trial court abused its discretion or erred as a matter of law." ***McHugh***, ***supra*** at 270 n.3.

Additionally, in this appeal, there is no claim that any of the challenged prospective jurors demonstrated a likelihood of prejudice by conduct, demeanor or answers to questions, the "second situation" in **McHugh** (following **Colon**). **McHugh**, **supra** at 270. Therefore, despite the dual bases asserted, the only reviewable issue presented to us in the first question is "the first situation" in **McHugh**, *viz.*, whether the court should have presumed a likelihood of prejudice based on "a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses[.]" (**Id.**).

However, as noted, our independent review confirms that none of the challenged prospective jurors had such "a close relationship with participants in the litigation" on which prejudice must be presumed. Instead, Appellants rely on real or perceived relationships with one or another of the Geisinger entities, even though by the time of the second jury selection no Geisinger unit was any longer a party to the litigation.[10] In effect, they ask us to expand the range of relationships requiring a presumption of *per se* prejudice. We decline to do so.

Preliminarily, we commend the trial court for its effort to synthesize the holdings in the various **Cordes** opinions into a unified body of controlling legal principles. Nevertheless, we are constrained to conclude that the trial

---

[10] Dr. Toms remained an employee of Geisinger Clinic.

court has not succeeded, and could not succeed, in discerning a consensus on binding principles which the *en banc* panel in ***Cordes*** could not achieve in the first place. Accordingly, Appellants' reliance on ***Cordes*** to expand the range of relationships from which prejudice must be presumed is misplaced.

"The categories of relationships which automatically call for removal should be limited because it is desirable to have a jury composed of persons with a variety of backgrounds and experiences." ***Colon***, ***supra*** at 328.

"Generally, the trial court is in the best position to assess the credibility of a juror and determine if that juror is able to render a fair and impartial verdict." ***McHugh***, ***supra*** at 273. Even the opinion in support of reversal in ***Cordes*** recognized that "no matter the *per se* nature of the applicable test, the trial court retains discretion to identify and assess the quality of the specific relationship at hand[.]" ***Cordes***, ***supra*** at 838.

Here, on independent review, we conclude that Appellants failed to show, or develop an argument, why any of the four identified prospective jurors should have been stricken for cause as presumptively prejudiced.

Appellants fail to establish that any of them had any **direct** close familial, financial or situational relationship with either of the parties, counsel, or witnesses, such that under controlling authority the trial court must presume the likelihood of prejudice. In particular, none knew Appellee Toms personally, none had ever worked with him, and none had been

treated by him as a patient. None were in an employer-employee relationship with him.

To the contrary, the assertions of a relationship through non-party Geisinger were indirect, and mostly attenuated, largely contradicted by the prospective jurors, and impermissibly dependent on supposition and facts not in evidence. Often they were transparently speculative.

Specifically, there was no evidence to establish that a (hypothetical) adverse verdict against Dr. Toms would "negatively financially effect" any other Geisinger unit, or for that matter, his own. (N.T. Jury Selection, 4/15/14, at 66-67). Several jurors mentioned the possibility of malpractice insurance. Others noted that the sheer size of Geisinger reduced the likelihood of an overall negative financial impact from a single, isolated event.

Counsel for Appellants offered no evidence to support their supposition that an adverse verdict would create a negative financial impact, let alone a ripple effect which would affect other Geisinger units. The trial court decided that there were no grounds to strike for cause. Appellants' claim of presumptive or *per se* prejudice by indirect relationships is unpersuasive, and, lacking support in controlling authority, fails.

Furthermore, the presumption of prejudice in the case of non-parties, with no proper foundation of affiliation established, is too indirect and

attenuated to justify an exception to the narrow limitations recognized by this Court in **Colon**.

Additionally, Appellants waived their exhaustion of challenges argument. (**See** Appellants' Brief, at 38-41). Counsel failed to preserve their claim by making a timely, specific objection of too few peremptories, and they did not request additional ones.[11] (**See** N.T. Jury Selection, 4/15/14, at 189-91). The only objections raised after the completion of jury selection were the general objection to Geisinger employees or patients based on **Cordes**, and the purported "cumulative impact" [of affiliation with Geisinger] giving the "appearance of taint." (**Id.** at 190).

On appeal, Appellants identify several seated jurors whom they now argue they would have stricken. (**See** Appellants' Brief, at 38-41). Counsel mentioned none of these at jury selection. To the contrary, counsel did not respond to the trial court's question, "Anything else?" (N.T. Jury Selection, 4/15/14, at 191). The claim of exhaustion is waived.

> It is axiomatic that in order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court.

---

[11] Appellants did raise the exhaustion of peremptory strikes in their original motion to strike. (**See** Motion to Strike Jurors, 2/14/13, at 3 ¶ 12). However, at that time Geisinger Medical Center and Geisinger Clinic were still party defendants. The trial court granted summary judgment in favor of the two Geisinger parties by order filed May 30, 2013. (**See** Order, 5/30/13). After the Geisinger units were dismissed, counsel for Appellants did not revise, amend, or otherwise modify their motion to strike, or the reasoning for it.

> Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated. In this jurisdiction one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*State Farm Mut. Auto. Ins. Co. v. Dill*, 108 A.3d 882, 885 (Pa. Super. 2015), *appeal denied*, 116 A.3d 605 (Pa. 2015) (citations, internal quotation marks and other punctuation omitted). Appellants' first question does not merit relief.

Appellants' second question challenges the trial court's jury instructions. (**See** Appellants' Brief at 6). They argue that the charge, permitting the jury to consider information given by Dr. Tom's qualified staff as part of the informed consent process, was erroneous, prejudiced them and resulted in the defense verdict. (**See id.** at 17; **see also id.** at 41-52). We disagree.

> In examining jury instructions, our standard of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. **Quinby v. Plumsteadville Family Practice, Inc.**, 589 Pa. 183, 907 A.2d 1061, 1069 (2006). Because this is a question of law, this Court's review is plenary. **Id.** at 1070. In reviewing a challenge to a jury instruction, the entire charge is considered, as opposed to merely discrete portions thereof. **Commonwealth v. Eichinger**, 591 Pa. 1, 915 A.2d 1122, 1138 (2007). Trial courts are given latitude and discretion in phrasing instructions and are free to use their own expressions so long as the law is clearly and accurately presented to the jury. **Id.**

- 21 -

*Cooper ex rel. Cooper v. Lankenau Hosp.*, 51 A.3d 183, 187 (Pa. 2012).

Here, the trial court, in support of its instruction, cites *Foflygen v. Allegheny Gen. Hosp.*, 723 A.2d 705, 711 (Pa. Super. 1999), *appeal denied*, 740 A.2d 233 (Pa. 1999), and *Bulman v. Myers*, 467 A.2d 1353, 1355 (Pa. Super. 1983).

In *Foflygen*, this Court explained:

> Because the validity of the patient's consent is based on the scope of the information relayed, rather than the identity of the individual communicating the information, we conclude that the trial court properly instructed the jury to consider the information presented by Appellee-surgeon's nurse along with that discussed by Appellee-surgeon when deliberating on the informed consent issue. Therefore, this issue is also meritless.

*Foflygen*, *supra* at 711 (citation omitted). We conclude the same principles apply here.

Similarly, in *Bulman*, this Court reasoned, "the primary interest of Pennsylvania jurisprudence in regard to informed consent is that of having the patient informed of all the material facts from which he can make an intelligent choice as to his course of treatment[.]" *Bulman*, *supra* at 1355 (citation omitted).

Appellants argue that *Foflygen* and *Bulman,* pre-date MCARE, which they do, and that they are clearly distinguishable, which they are not. (*See* Appellants' Brief, at 45). Appellants' purported distinction, that those cases involved nurses, while this case involves a physician's assistant, is patently trivial and legally frivolous. Furthermore, and more substantively,

- 22 -

Appellants fail to develop an argument supporting their principal, if implicit, claim, that the enactment of MCARE preempted the holding and principles of *Foflygen* and *Bulman*.  (*See* Appellants' Brief, at 41-52).

To the contrary, we conclude that the purposes of MCARE are better served by the encouragement of the dissemination of as much accurate information about prospective surgery as possible.  "Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure." 40 Pa.C.S.A. § 1303.504(b).

Here, the court's instruction accurately informed the jury of the law. We discern no error and no prejudice.  Appellants' second claim merits no relief.

Appellants' third question challenges the denial of their motion *in limine* to preclude reference to the consent form Mrs. Shinal signed.  (*See* Appellants' Brief, at 6).  They appear to argue that because Mrs. Shinal claimed that her consent was not properly informed, admission of the standard consent form, which she signed, was "unfairly prejudicial."  (*Id.* at 55; *see also id.* at 52-59).  We disagree.

"In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law."  *Yacoub v. Lehigh Valley Med.*

***Associates, P.C.***, 805 A.2d 579, 588 (Pa. Super. 2002), *appeal denied*, 825 A.2d 639 (Pa. 2003) (citation omitted).

Here, Appellants concede that the effort to conceal Mrs. Shinal's signing of a standard consent form "appears disingenuous." (Appellants' Brief, at 55). We agree. Appellants offer no controlling authority whatsoever in support of their claim that they had a legal justification to conceal the fact that Mrs. Shinal signed a standard consent form for her surgery. (***See id.*** at 52-59). They argue that the form was not specific enough, but offer no supporting authority for that claim either.

The trial court permitted Mrs. Shinal to explain her position at trial, and gave a limiting instruction on the significance of the consent form. We discern no abuse of discretion. Appellants' third claim does not merit relief.

Finally, Appellants claim generically that the trial court erred or abused its discretion in denying their motion for post-trial relief. (***See id.*** at 6). However, Appellants only present a one-sentence boilerplate claim to this effect, (***see id.*** at 59);[12] they fail to develop any argument and they offer no supporting authority. Appellants' catch-all claim is waived. ***See*** Pa.R.A.P. 2119(a), (b).

_____

[12] In its entirety, the claim states: "Additionally, based upon the foregoing, Appellants/Plaintiffs respectfully submit that the trial court committed an error of law and/or abuse of discretion in denying Plaintiffs' Motion for Post Trial Relief." (Appellants' Brief, at 59).

- 24 -

Our reasoning differs somewhat from that of the trial court. However, we may affirm the decision of the trial court on any valid basis appearing of record. *See Louis Dreyfus Commodities Suisse SA v. Fin. Software Sys., Inc.*, 99 A.3d 79, 82 (Pa. Super. 2014).

Judgment affirmed.

Judge Allen joins the Opinion.

Judge Lazarus files a Dissenting Statement.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/25/2015