J. A18013/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| RUFUS WALKER, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| LANCASTER GENERAL, | : | |
| THE LANCASTER GENERAL HOSPITAL, | : | |
| ALISON JOHANNA HARTEMINK, M.D., | : | No. 2036 MDA 2014 |
| BRET M. LEVY, M.D., AND LANCASTER | : | |
| EMERGENCY ASSOCIATES, LTD. | : | |

Appeal from the Judgment Entered November 24, 2014,
in the Court of Common Pleas of Lancaster County
Civil Division at No. CI-08-10428

BEFORE: FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED FEBRUARY 03, 2016**

Rufus Walker appeals from the judgment entered November 24, 2014, following a defense verdict in this medical malpractice action. Following careful review, we affirm.

The trial court has aptly summarized the history of this case as follows:

> This is a medical-malpractice case involving the care and treatment that Defendant Alison Johanna Hartemink, M.D.[Footnote 1] and Defendant Bret M. Levy, M.D. provided to Plaintiff, Rufus Walker, on three occasions in the Emergency Department at Lancaster General Hospital (individually, "LGH" and, collectively with Defendant Lancaster General, "LG Defendants"). Dr. Hartemink and Dr. Levy both were emergency-medicine

physicians and were employed by or partners of Defendant Lancaster Emergency Associates, Ltd. (collectively, the "LEA Defendants"). (N.T. Trial Vol. 5 at 593:23-594:3.)

> [Footnote 1] At the time of trial, Dr. Hartemink used her married name of Dr. Railsback. For the sake of clarify [sic], this Opinion will refer to her as Dr. Hartemink, consistent with the caption, even though she was referred to during the trial by her married name.

On September 12, 2006, Plaintiff, a 30-year-old black male, presented to the Emergency Department of LGH, where he was seen by Dr. Hartemink for a complaint of diffuse back pain and a lifting injury.[Footnote 2] (N.T. Trial Vol. 5 at 471:2-5, 472:10-15.) Her impression was that he had back pain with "no evidence of neurologic involvement with his back pain, which . . . was consistent with the musculoskeletal back pain." (N.T. Trial Vol. 5 at 479:22-480:3.) On September 23, 2006, Plaintiff returned to LGH's Emergency Department, where Dr. Levy saw him. (N.T. Trial Vol. 5 at 561:15-20.) Dr. Levy was aware that Plaintiff had seen Dr. Hartemink at the earlier visit to the Emergency Department. (N.T. Trial Vol. 5 at 565:6-7.) He testified that, based on the history from the patient, his own physical examination of the patient, and a negative MRI of the lumbar spine, he did not have any reason to suspect a disease with spinal-cord involvement. (N.T. Trial Vol. 5 at 584:10-15.) On October 2, 2006, Plaintiff returned to LGH's Emergency Department again, at which time he was seen by Dr. Hartemink. On that date, Dr. Hartemink reviewed his charts, including Dr. Levy's notes and the report of the MRI that Dr. Levy had obtained and a radiologist interpreted. (N.T. Trial Vol. 5 at 487:9-12, 493:3-14.) Her impression was that "he had severe low back pain based on the history of the lifting injury, the continued symptoms of significant pain in that area, and then the ED courses, the

emergency department course." (N.T. Trial Vol. 5 at 498:4-7.) At each presentation to the Emergency Department, Plaintiff was discharged without admission after being examined by Dr. Hartemink or Dr. Levy. The examination at each of the three visits included a neurologic component. (N.T. Trial Vol. 5 at 475:15-19, 478:5-479:11, 497:5-24, 575:3-580:8.)

> [Footnote 2] Plaintiff injured his back while carrying a shopping cart filled with groceries from ground level to his second-floor apartment. (N.T. Trial Vol. 1 at 107:7-22.)

On November 15, 2006, Plaintiff presented to a different local hospital by ambulance. (N.T. Trial Vol. 1 at 137:4-6.) At that time, he was admitted, and he was later discharged to a rehabilitation facility on December 3, 2006, at which time his diagnosis was, among other things, transverse myelitis secondary to neurosarcoidosis. (N.T. Trial Vol. 2 at 292:5-9, 194:25-195:1.)

At trial, Plaintiff sought to prove that the care and treatment he received from Dr. Levy on September 23, 2006 and from Dr. Hartemink on October 2, 2006 was negligent in that they failed to diagnose and treat his transverse myelitis and that such failure caused him harm and/or increased the risk of harm to him. Generally stated, Plaintiff contended that the physician-defendants failed to recognize that Plaintiff's signs and symptoms were early signs of a spinal-cord problem, not caused by a back problem as they believed; the physician-defendants should have referred Plaintiff to a neurologist and done further work-up; and, had the additional work-up been completed and/or referral been made, the transverse myelitis would have been identified and could have been treated with steroids to improve or at least stop the progression of the condition.

Defendants denied all liability, challenging both negligence and causation. At trial, their position, generally stated, was that the physician-defendants met or exceeded the standard of care for emergency-medicine physicians, Plaintiff's condition on each visit to the physician-defendants was musculoskeletal-related, and, further, Plaintiff's transverse myelitis did not develop until sometime after the physician-defendants last saw Plaintiff.

Several non-party physicians testified as trial experts. Dr. Frederick Levy, who testified via videotaped deposition for use at trial, was Plaintiff's liability expert in emergency medicine. Also testifying for Plaintiff was Dr. David E. Jones, who was qualified as an expert in neurology and neuroimmunology on the question of causation. Dr. Daniel R. Wehner, an emergency-medicine physician, testified via videotape as the defense standard-of-care expert.

After a seven-day trial, the jury rendered a defense verdict on June 24, 2014, finding no negligence on the part of either doctor. (N.T. Trial Vol. 7 at 760:4-14.) On June 30, 2014, Plaintiff filed a timely Post-Trial Motion ("Motion"), alleging eleven errors by this Court which warranted the grant of a new trial.[Footnote 3] The LG Defendants and the LEA Defendants filed their responses on July 10, 2014 and July 14, 2014, respectively.

> [Footnote 3] *See* Pa. R. Civ. P. 227.1(c) (stating that post-trial motions shall be filed within ten days after a verdict).

By Order dated July 15, 2014, I directed Plaintiff to file an amended post-trial motion, "which amendment shall be limited to citing with specificity where in the record each of the claims raised in Paragraphs 1-11 were preserved," as well as directing him to file a proper request for the trial transcript. On September 10, 2014, Plaintiff filed a timely Amended Motion for Post-Trial Relief ("Amended Motion"). The LEA Defendants and the

LG Defendants filed their responses on September 19, 2014 and September 22, 2014, respectively. With their response to the Motion and response to the Amended Motion, the LG Defendants asserted an alternative Cross-Motion for Post-Trial Relief on the Issue of Ostensible Agency.[Footnote 4]

[Footnote 4] Plaintiff alleged that the physician-defendants were ostensible agents of LGH for the purpose of a vicarious-liability claim. The jury never answered the ostensible-agency questions on the Verdict Sheet (Questions 7 and 8) because, before they would have proceeded to that question, they found that the physician-defendants were not negligent (Questions 1 and 2).

Trial court opinion, 11/18/14 at 1-5.

On November 18, 2014, the trial court denied appellant's amended post-trial motion, as well as the LG defendants' cross-motion for post-trial relief on the issue of ostensible agency. On November 24, 2014, judgment was entered in favor of the defendants and against appellant. This timely appeal followed on December 2, 2014. Appellant complied with Pa.R.A.P. 1925, and the trial court filed a Rule 1925(a) opinion, relying on its prior opinion and order of November 18, 2014, disposing of post-trial motions.

Appellant has raised the following questions for this court's review:

A. IS IT AN ERROR OF LAW AND/OR AN ABUSE OF DISCRETION TO LIMIT A TREATING PHYSICIAN SPECIALIST TO THE FACTS CONTAINED IN HIS MEDICAL RECORDS AND TO PRECLUDE HIM FROM OFFERING ANY EXPERT TESTIMONY WITH REGARD TO

CAUSATION OR TO THE EXISTENCE AND PROGRESS OF THE DISEASE FOR WHICH HE TREATED THE PATIENT?

B. IS IT AN ERROR OF LAW AND/OR AN ABUSE OF DISCRETION TO PERMIT DEFENDANTS WHO HAD LITTLE OR NO RECOLLECTION OF EVENTS BEYOND THE MEDICAL RECORDS AND WHO HAD NOT PROVIDED EXPERT REPORTS PURSUANT TO PA.R.C.P. 4003.5(a)(1)(b) TO TESTIFY AS TO WHAT THEY DID, THAT WHAT THEY DID WAS APPROPRIATE, AND WITHOUT BEING QUALIFIED TESTIFIED AS EXPERTS BEYOND THEIR QUALIFICATIONS?

C. DID THE TRIAL COURT COMMIT AN ERROR OF LAW AND/OR ABUSE HIS DISCRETION IN NOT GRANTING A NEW TRIAL WHEN THE DEFENSE CHANGED THEIR THEORY OF THE CASE AT THE END OF THE TRIAL?

D. DID AN ERROR OF LAW OCCUR WHEREIN THE COURT CONDUCTED THE VOIR DIRE AND DID NOT EXCLUDE FOR CAUSE THE NUMEROUS INDIVIDUALS WHO HAD EMPLOYMENT OR OTHER RELATIONSHIPS WITH DEFENDANT LANCASTER GENERAL HOSPITAL?

E. WAS THE JURY VERDICT CONTRARY TO THE UNDISPUTED FACTS AND EVIDENCE?

Appellant's brief at 5.

In his first issue on appeal, appellant argues that the trial court erred in granting the LEA defendants' pre-trial motion **_in limine_** to limit the testimony of his treating physician, Hany G. Salama, M.D., a neurologist.[1] The defendants sought to preclude Dr. Salama from offering expert

---

[1] The LG defendants joined in the motion.

testimony at trial, limiting him to the matters outlined in his August 12, 2013 letter to plaintiff's counsel, and to material contained in his office chart. Dr. Salama's deposition was scheduled for May 29, 2014.

On May 9, 2014, appellant filed a responsive brief, arguing that because Dr. Salama was appellant's treating physician, his opinions were not subject to the rules of expert witness discovery, including Pa.R.C.P. 4003.5. However, appellant agreed that Dr. Salama should be precluded from testifying regarding "standard of care liability emergency room issues." Appellant argued that Dr. Salama should be allowed to testify regarding diagnosis and treatment as well as factual causation. Appellant also argued that Dr. Salama should be permitted to testify from all medical records produced during discovery and not limited to his August 12, 2013 letter.

On May 28, 2014, before the trial court had ruled on the motion *in limine*, appellant canceled Dr. Salama's videotape deposition. Then, on June 6, 2014, he filed an amended pre-trial conference memorandum and trial brief in which he amended his witness list, removing Dr. Salama. Apparently, appellant decided not to call Dr. Salama as a trial witness, as he did not reserve the right to supplement the witness list. (Trial court opinion, 11/18/14 at 23.) On June 9, 2014, the trial court granted the motion in part, and denied it in part, permitting Dr. Salama to use all of the available medical records as well as the August 12, 2013 letter, but precluding him from offering any expert testimony regarding the appropriate standard of

care, the alleged negligence of any defendant, or causation.[2] Therefore, the trial court's order did not preclude Dr. Salama from testifying as a subsequent treating neurologist in accordance with all of the medical records and Dr. Salama's August 12 letter including appellant's symptoms on physical examination, his history, diagnosis, and treatment, as well as appellant's current condition and prognosis. However, appellant chose not to call Dr. Salama as a witness at trial.

In determining that it would be improper for Dr. Salama to testify as to any expert opinions he held outside his capacity as a treating provider, the trial court found that appellant violated Rule 4003.5 by failing to identify Dr. Salama as an expert witness.[3]

---

[2] Regarding emergency room standard of care, Dr. Salama would not meet the same specialty requirement of the MCARE Act, 40 P.S. § 1303.512(c).

[3] Rule 4003.5 provides, in relevant part:

> (a)   Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
>
> (1)   A party may through interrogatories require
>
> (A)   any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
>
> (B)   subject to the provisions of subdivision (a)(4), the other party

"The admissibility of evidence is a matter addressed solely to the discretion of the trial court and may be reversed only upon a showing that the court abused its discretion." ***Commonwealth v. Marshall***, 743 A.2d 489, 492 (Pa.Super. 1999), ***appeal denied***, 757 A.2d 930 (Pa. 2000) (citation omitted). "Thus our standard of review is very narrow . . . . To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***McManamon v. Washko***, 906 A.2d 1259, 1268-1269 (Pa.Super. 2006), ***appeal denied***, 921 A.2d 497 (Pa. 2007) (citations omitted).

Rule 4003.5 applies to discovery of experts that a litigant has retained or specifically employed in the course of preparing for litigation. Generally

---

to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.

(b) An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action.

speaking, Rule 4003.5 does not apply to treatment providers whose opinions were not acquired in anticipation of litigation. The trial court relies on *Kurian v. Anisman*, 851 A.2d 152 (Pa.Super. 2004), and *Polett v. Public Communications*, 83 A.3d 205 (Pa.Super. 2013) (*en banc*), *reversed*, ___ A.3d ___, 2015 WL 6472419 (Pa. filed October 27, 2015).

In *Kurian*, the plaintiffs/appellants argued that Ancy Kurian's treating physician, Dr. Alvin Chin, was exempt from expert disclosure requirements as his opinions were not acquired in anticipation of litigation. *Kurian*, 851 A.2d at 155. This court disagreed, finding that in his report, Dr. Chin never came to a conclusion as to whether the defendant doctor deviated from the standard of care or whether this deviation was a proximate cause of Ancy's injuries. *Id.* at 156. In his 1997 report, Dr. Chin merely stated that Ancy's large patent ductus arteriosus must have been present in 1990, when Ancy had an echocardiogram by Dr. Paul Anisman, and was not diagnosed correctly at that time. *Id.* However, in his treatment notes, Dr. Chin offered no opinions regarding standard of care or causation:

> This is hardly surprising. A doctor is concerned with treating his patients, not about whether a prior doctor's breach of a particular standard of care was the factual cause of his patient's injuries. Further, based on the report, it does not appear as if Dr. Chin **could** have come to the conclusions appellants desire; his report shows that he never even looked at the 1990 echocardiography.
>
> The fact that Dr. Chin never came to a pre-anticipation of litigation conclusion as to whether Dr. Anisman breached the physician's standard of

- 10 -

> care and whether such a breach was the proximate
> cause of the harm Ancy suffered is fatal to this claim.

*Id.* (emphasis in original). *Cf. Polett*, *supra* (trial court did not abuse its discretion by allowing treating physician to testify as an expert, where he had reached an opinion as to causation before the prospect of litigation had surfaced, as evidenced by his treatment notes as well as his deposition testimony; he was concerned about the cause of his patient's knee injury because it was determinative of whether the inflammation and pain she was experiencing was caused by an infection, or, alternatively, if it was mechanical in origin).[4]

Instantly, Dr. Salama's August 12, 2013 report discussed appellant's diagnosis of myelopathy secondary to neurocarcoidosis, his current medical condition, and prognosis. Dr. Salama's letter contains no opinion whatsoever as to standard of care, negligence, or causation issues. Dr. Salama was initially listed as a damages witness. Indeed, appellant stated in his response to the motion *in limine* that he did not intend to

---

[4] As stated above, the trial court relied on this court's opinion in *Polett*, in which a majority of the *en banc* panel found that the trial court should not have permitted the treating physician to provide expert testimony, as he was not disclosed as an expert witness by the Poletts, nor did he prepare an expert report. The majority concluded that the treating physician's causation opinions were not developed during the regular course of treatment, but, rather, arose under the "sword of litigation." However, this court's decision in *Polett* has since been reversed by our supreme court, which determined that the trial court did not abuse its discretion in ruling that the treating physician's testimony as to causation was not barred by Rule 4003.5.

question Dr. Salama regarding emergency medicine standard of care or negligence; nor, as a neurologist, could Dr. Salama testify as to the standard of care of an emergency room doctor. As far as factual causation, there is nothing in the August 12 letter to suggest that Dr. Salama reached an opinion on causation during the course of treating appellant and before litigation was anticipated, and appellant makes no offer of proof in this regard. The August 12 letter discusses only Dr. Salama's care and treatment as well as his thoughts on prognosis. **Cf. Polett**, **supra** (treating physician first formed his causation opinion in 2006, two years before suit was instituted, as reflected in his treatment notes, and the cause of his patient's injuries (riding an exercise bike) was critical to his chosen treatment).

Here, the alleged breach of the standard of care, in not recognizing early signs of spinal cord involvement during appellant's three ER visits, referring him to a neurologist, and administering steroids which could have halted or even reversed the progression of the disease, does not appear to be critical to Dr. Salama's treatment plan, as in **Polett**. In addition, there is no record as to Dr. Salama's proposed testimony on causation. Appellant canceled his deposition and removed him from the witness list <u>before</u> the trial court ruled on the defendants' motion.

At any rate, appellant cannot show how he was prejudiced by the trial court's ruling, for several reasons. First, the jury never reached the issue of

causation because they found the physician-defendants non-negligent. Second, Dr. Salama's testimony would have been cumulative of the expert testimony of Dr. Jones and Dr. Frederick Levy, who did testify at trial regarding standard of care, liability, and causation. **See** Pa.R.E. 403 ("The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). (Trial court opinion, 11/18/14 at 20-22 (discussing expert testimony of Dr. Jones and Dr. Frederick Levy).) There is no error here.

In his second issue on appeal, appellant argues the trial court erred in allowing the physician-defendants, Drs. Levy and Hartemink, to offer "expert testimony" to the effect that appellant's spinal cord problem developed after his last ER visit on October 2, 2006. Appellant argues that neither Dr. Levy nor Dr. Hartemink was a neurologist or neuroimmunologist, nor did they provide an expert report prior to trial. Appellant contends that this was a previously undisclosed defense theory and Dr. Hartemink was not qualified to render a neurological opinion. Appellant also complains that Dr. Hartemink had no independent recollection of appellant.

Initially, we observe that the only decision cited by appellant in support of his argument is **Chiodetti v. Fernandes**, 120 A.3d 371 (Pa.Super. 2015) (unpublished memorandum). As an unpublished

memorandum decision, **Chiodetti** is non-precedential and is not to be cited or relied upon by any party, except under extremely limited circumstances not present here. **See** Super.Ct. IOP § 65.37(A), 42 Pa.C.S.A. ("An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding, except that such a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, res judicata, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding."). As such, we will not consider **Chiodetti**.

As appellant limits his argument to Dr. Hartemink's testimony, we will do the same.[5] At trial, defense counsel asked Dr. Hartemink,

> Also, under the circumstances as they existed at the time, on September 12th and October 2nd, 2006, did you have any reason to suspect or investigate that Mr. Walker had some sort of disease process rare or not, that was somehow affecting his spinal cord?

Notes of testimony, trial, 6/20/14, Vol. 5 at 468. Plaintiff's counsel requested a sidebar and complained,

> Your Honor, this witness has no independent recollection of either of these visits. She only knows what's in the records, so this would be an inappropriate question. And any other questions

---

[5] We note that Dr. Levy did, in fact, have an independent recollection of appellant and was not merely testifying from his office notes. (Trial court opinion, 11/18/14 at 28 n.18.)

> that have to do with what happened on either of these occasions that is not in the record she cannot testify to.

*Id.* at 469. The trial court did not make a ruling, but simply asked counsel to "sit down," stating, "That's cross examination." (*Id.*) Defense counsel rephrased the question:

> Again, under the circumstances as they existed at the time on those two dates, based on your training and experience at the time, was there any reason for you to suspect or investigate a disease, rare or not, being present that was in any way affecting Mr. Walker's spinal cord?

*Id.* Without objection, Dr. Hartemink replied,

> No. If a patient had a clearly documented lifting injury and symptoms that were consistent with a lifting injury, and no other symptoms, that would not make you think of a systemic illness going on.

*Id.* at 469-470.

We note that appellant did not argue Dr. Hartemink was not a neurologist or was not qualified to render an expert opinion, or that the defense was introducing a previously undisclosed theory of defense at trial, only that Dr. Hartemink did not have an independent memory of the September 12th and October 2nd office visits. However, appellant never availed himself of the opportunity to attack Dr. Hartemink's memory through cross-examination. (Trial court opinion, 11/18/14 at 30.)

Dr. Hartemink was a named defendant and was not limited by Rule 4003.5, which governs discovery of opinions that a party or a potential

- 15 -

party to litigation solicits from a non-party expert. ***Neal by Neal v. Lu***, 530 A.2d 103, 106 (Pa.Super. 1987). As a physician-defendant, Dr. Hartemink could certainly testify as to why she did not feel it was necessary to refer appellant to a neurologist, without submitting an expert report. In ***Neal***, the appellants objected to the physician-defendant, Dr. Lu's causation testimony, arguing, ***inter alia***, that Dr. Lu was attempting to testify as a medical expert even though he had neither listed himself as a prospective expert witness nor furnished the appellants with a synopsis of his proposed testimony pursuant to general and local rules of discovery. ***Id.*** at 105-106. This court disagreed, finding that Rule 4003.5 did not apply to the testimony of Dr. Lu where his expert opinion was not acquired or developed in anticipation of litigation:

> The doctor did not "acquire" his opinions on the treatment of Rebecca's finger "in anticipation of litigation." He did not expend time and money developing his own knowledge or employing himself as an expert to gain a tactical advantage in the law suit brought against him by appellants. His opinions and knowledge, in short, were not the work product of a well-prepared litigant. They pre-dated any litigation and are the very gist of appellants' cause of action. As such, they fall outside any reasonable definition of the phrase "acquired or developed in anticipation of litigation."

***Id.*** at 108. "The Rule simply does not apply to expert opinions of a party when a matter within that party's field of expertise is at issue." ***Id.*** ***See also*** Pa.R.C.P. 4003.5, comment ("It should be emphasized that Rule 4003.5 is not applicable to discovery and deposition procedure where a

defendant is himself an expert, such as a physician, architect or other professional person, and the alleged improper exercise of his professional skills is involved in the action."). As such, Dr. Hartemink could testify as to whether appellant was exhibiting symptoms of spinal cord disease which would warrant referral to a specialist, or whether, given his history of a lifting injury and the results of neurological testing, his symptoms were consistent with a musculoskeletal disorder. Appellant's argument that Dr. Hartemink, a physician-defendant, had to submit an expert report and comply with expert discovery rules is wholly without merit.[6]

In addition, although Dr. Hartemink had no independent recollection of examining appellant, she could testify from the medical records and her habit and routine as a treating physician. Pa.R.E. 406.[7] She was not

---

[6] In fact, as the trial court observes, appellant repeatedly elicited such testimony during his cross-examination of Dr. Hartemink, *i.e.*, that there was no evidence of spinal cord involvement during appellant's three ER visits at LGH and the spinal cord condition must have developed between the date of his last ER visit, October 2, 2006, and November 15, 2006, when he was admitted to the hospital. (Trial court opinion, 11/18/14 at 28-29.)

[7]
    Q. And these routines that you develop by virtue of your education and training allow you to say with a very good deal of certainty what exam you did on a particular day and what your documentation tells you, even if, you know, years down the road, eight years, for example, let's just say, you can't recall what occurred as if it was a movie playing in your head?

    A. Correct.

Notes of testimony, trial, Vol. 5, 6/20/14 at 524.

required to actually remember appellant from eight years prior in order to testify regarding her examination, diagnosis, and treatment. The trial court did not err in permitting Dr. Hartemink's testimony.

In his third assignment of error, appellant argues that he was prejudiced by the defendants' decision not to call certain expert witnesses including their neurologist, Dr. Katz, and their emergency room doctor, Dr. Cosgrove. According to appellant, the defendants changed their theory at trial, claiming, for the first time, that appellant's spinal cord disease started sometime after October 2, 2006. (Appellant's brief at 35.) Appellant posits that the defendants did not call these expert witnesses because they would have contradicted this new position and testified in accordance with their expert reports, *i.e.*, that appellant's disease process was in its early stages during the three ER visits, was steadily progressing, and did not suddenly appear after October 2, 2006. (*Id.*) Appellant argues that this was trial by ambush and he was entitled to some sort of jury instruction. (*Id.* at 34-35.)

First, we note that appellant did not make any objection at trial, nor did he request a jury instruction. (Trial court opinion, 11/18/14 at 31.) Therefore, the matter is deemed waived. **See** Pa.R.C.P. 227.1(b)(1) ("Except as otherwise provided by Pa.R.E. 103(a), post-trial relief may not be granted unless the grounds therefor, (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for

findings of fact or conclusions of law, offer of proof or other appropriate method at trial . . .").  This issue was raised for the first time in appellant's post-trial motion.  As the trial court states, during the course of trial, it became obvious that the defendants would not be calling certain witnesses, including the neurologist, yet appellant did not raise the issue.  (Trial court opinion, 11/18/14 at 31.)

In addition, appellant cites no authority for the proposition that the defendants were required to call every witness on their witness list, or else suffer an adverse instruction.  The only case cited by appellant is *Chiodetti*, *supra*, which is non-precedential, and, according to our Internal Operating Procedures, should not be cited.  The plaintiff bears the burden of proof and the defendants were not obligated to call every witness.  As the trial court observes, a trial is a fluid process and counsel is not required to adhere to a particular theory of the case as articulated during pre-trial discovery.  (*Id.* at 33.)  Apparently, the defendants decided not to call Dr. Katz because they were satisfied that Dr. Jones' testimony provided them with a defense.  (*Id.* at 31-32.)  Dr. Jones testified to the rarity of appellant's condition; that there is no evidence that administration of steroids alters its course; that it generally develops over a period of days, rather than weeks or months; and that appellant had increased symptoms subsequent to his treatment with the

defendants. (*Id.*) Certainly, if defense counsel referenced Dr. Katz or other witnesses during trial and then failed to call them to the stand, appellant could alert the jury to their absence; however, even if this matter were preserved, which it is not, appellant would not be entitled to post-trial relief for a defendant's decision not to call a particular witness.

In his fourth issue on appeal, appellant contends that the trial court erred in allowing jurors to serve who were employees or otherwise associated with LGH, but stated during *voir dire* that they could be fair and impartial. (Appellant's brief at 36.) Appellant states that LGH is one of Lancaster's largest employers. (*Id.*) Appellant concedes that he did not object to the *voir dire* process or challenge any of the prospective jurors for cause, but claims that a recent decision of this court, *Cordes v. Associates of Internal Medicine*, 87 A.3d 829 (Pa.Super. 2014) (*en banc*), *appeal denied*, 102 A.3d 986 (Pa. 2014), changed the legal landscape in this area. In his reply brief, appellant asserts that he had no basis to object until our supreme court denied *allocatur* in *Cordes*. (Appellant's reply brief to brief of LEA defendants and Drs. Levy and Hartemink at 22-23.)

In *Cordes*, the opinion in support of reversal by Judge Wecht found that certain jurors' close familial relationships with patients of the physician-defendant warranted a finding of *per se* prejudice, despite their assurances during *voir dire* that they could be fair and impartial. *Cordes*, 87 A.3d at 842-843. Judge Wecht concluded that the trial court failed to

give due regard to the importance of ensuring a jury that is not only impartial in fact, but also in appearance. *Id.* at 842-846. Judge Wecht also found that empanelment of a third juror, who testified he could deliberate impartially despite his employment relationship with Heritage Valley Health System which had an undisputed financial interest in the outcome of the litigation, "created a sufficient risk of partiality to establish prejudice *per se* arising from his jury service." *Id.* at 845 (footnote omitted). Again, in so holding, Judge Wecht emphasized avoiding even the appearance of partiality or bias.

There are several problems with appellant's argument. First, *Cordes* was a plurality decision and is not binding precedent. *See Shinal v. Toms*, 122 A.3d 1066, 1076 n.8 (Pa.Super. 2015) (explaining that *Cordes* is not controlling authority and that while a majority of the *en banc* panel concurred in the result in *Cordes*, the judges did not agree on the rationale for the result). Second, in *Cordes*, the appellant challenged the prospective jurors for cause. Instantly, appellant did not argue that any of the individuals employed by, or who had a close association with, LGH should be stricken for cause, nor did appellant make any objections during *voir dire* or request the trial court to ask additional questions. (Trial court opinion, 11/18/14 at 33-34.) Therefore, the matter is waived. *See Shinal*, 122

A.3d at 1078 (finding appellants' exhaustion of peremptory challenges argument waived where they failed to raise the issue at trial).[8]

Finally, in his statement of questions involved, appellant raises a weight of the evidence claim; however, he does not argue the issue in his brief. Therefore, it is deemed waived. *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").[9]

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/3/2016

---

[8] We also note that **Cordes** was decided on March 12, 2014, and jury selection took place in this case on June 16, 2014, three months later.

[9] Appellant makes a fleeting reference to the issue in his reply brief; however, reply briefs may not be used as an opportunity to raise additional issues on appeal. Pa.R.A.P. 2113. Furthermore, the trial court likewise found appellant's weight of the evidence claim waived, as mere boilerplate. (Trial court opinion, 11/18/14 at 37.)