J-A32010-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CARLTON G. KELLY AND MARGARET M. KELLY, HIS WIFE, INDIVIDUALLY AND ON BEHALF OF PARADISE HILLS, L.L.C., AND PARADISE HILLS, L.L.C., A PENNSYLVANIA LIMITED LIABILITY COMPANY, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ROBERT VENNARE AND PAMELA M. VENNARE, HIS WIFE, AND HORSE N' SOUL, INC., A PENNSYLVANIA CORPORATION, | |
| APPEAL OF: ANTHONY F. JESELNIK, | |
| Appellant | No. 2069 WDA 2014 |

Appeal from the Order December 9, 2014
In the Court of Common Pleas of Allegheny  County
Civil Division at No(s): G.D. No. 08-011997

BEFORE:  SHOGAN, OTT, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 16, 2016**

This is an appeal from an order denying the request for an attorney's charging lien filed by Appellant, Anthony F. Jeselnik, after he was discharged and the underlying litigation settled.  Appellant argues, *inter alia*, that the trial court erred in requiring that he prove an express fee agreement with his prior clients, rather than he just prove an agreement that he would look to the fund created by the litigation for payment of his legal fee, in seeking a charging lien.  Precedent establishes that an attorney cannot recovery on a contractual basis when discharged by a client. ***Angino & Rovner v. Lessin***,

___ A.3d ___, ___, 2016 PA Super 2 (Pa. Super. filed January 5, 2016). An attorney's only recovery is in equity. Accordingly, we hold that a discharged attorney is not barred from seeking a charging lien simply because the discharged attorney has failed to prove an express fee agreement, assuming that he has proven that an attorney-client relationship existed and that there was an agreement that the attorney look to the fund for payment. In this case, the record demonstrates that an attorney-client relationship existed and that the parties had agreed that Appellant would look to the fund created by the litigation for payment. Accordingly, we vacate and remand for further proceedings.

We summarize the facts and procedural history of this case as follows. Appellant sought the lien against the fund created for the benefit of Carlton and Margaret Kelly ("the Kellys"). The fund resulted from the settlement of litigation between the Kellys, who Appellant represented over a seven-year period, and Robert and Pamela Vennare ("the Vennares").[1] Appellant alleged he represented the Kellys, who were close personal friends, from May of 2006 until they discharged him in February of 2014. Deposition of Appellant, 9/17/14, at 14, 18. The Kellys hired new counsel, settled their case seven months later on August 21, 2014, and received an immediate

_____

[1] The Vennares' counsel, Richard P. Joseph, also sought a charging lien to guarantee payment for legal services he provided to the Vennares. He has withdrawn the appeal he filed in the instant case.

- 2 -

payment of $296,263.47 from the escrow account, with additional monthly gas royalties from Range Resources, Inc. Appellant asserted that his legal fee was $381,120.00 for his work in excess of 2,000 hours on the case.

The trial court further described the underlying litigation as follows:

> The legal services for which Mr. Jeselnik and Mr. Joseph seek compensation were provided following the creation of a partnership (Paradise Hills, L.L.C.) to purchase a horse farm.
>
> Paradise Hills was organized by Mr. and Ms. Kelly and Mr. and Ms. Vennare. The Kellys and the Vennares executed an Operating Agreement, effective August 23, 2006, that governed the affairs of Paradise Hills. Under the Operating Agreement, Paradise Hills was authorized to issue 200 units. All 200 units were issued as follows: 49 units to Mr. Vennare; 49 units to Ms. Vennare; 51 units to Mr. Kelly; and 51 units to Ms. Kelly.
>
> While the Kellys, apparently as a result of their 51% share, served as the managers of Paradise Hills, the Operating Agreement provided that the managers may act only upon a 75% or 100% vote. For example, Section 8.01(a) provides that no amendments may be made that would reduce the ownership interest of any member or that would reduce the member's rights to allocation and distributions without the consent of each member adversely affected thereby. In other words, the Kellys, as 51% owners, could not make important decisions; these decisions required at least a 75% vote.
>
> Paradise Hills purchased a farm located in Washington County, Pennsylvania. The property contains significant gas and oil reserves which are subject to a "Consent to Utilize" between Paradise Hills and Range Resources. Shortly after the purchase of the farm, Paradise Hills entered into a lease with Horse 'N Soul, Inc., a nonprofit corporation operated by the Vennares to provide equine-assisted therapy to children with emotional and developmental disorders.
>
> Disputes between the Kellys and the Vennares with respect to Paradise Hills began soon after the parties entered into the Operating Agreement. The disputes appear to be over the Vennares' dissatisfaction with the way the Kellys were operating

Paradise Hills, and disagreements relating to capital contributions.

[U]nder the Operating Agreement, the Kellys owned 51% and the Vennares 49% of Paradise Hills. During this litigation, both the Kellys and the Vennares contended that, because of certain events occurring after the execution of the Operating Agreement, they were entitled to a greater ownership interest. On several occasions, [the trial court] ruled that the ownership interests would continue to be governed by the terms of the Operating Agreement providing for the Kellys to own 51% and the Vennares to own 49% of Paradise Hills.

\* \* \*

[The Settlement] Agreement, generally based on a 51%-49% ownership, provided:

> (1) $293,750 will be distributed to the Kellys from the escrow account and Paradise Hills, at the direction of the four owners, will transfer to the Kellys 60% of the Paradise Hills oil and gas rights; and

> (2) the balance in the Escrow Account shall be distributed to Paradise Hills and the Kellys will assign and transfer to Paradise Hills the Kellys' membership interest in Paradise Hills so that the Vennares are now 100% owners of Paradise Hills which now owns 40% of all oil and gas rights.

Trial Court Opinion, 12/9/14, at 2–4.

As noted, the Kellys discharged Appellant in February 2014, hired new counsel, and soon thereafter, settled the litigation. On July 11, 2014, Appellant filed a notice of charging lien and motion for rule to show cause why it should not be granted. Appellant asserts that the litigation between the Vennares and the Kellys was "lengthy, intense, and multifaceted."

- 4 -

Appellant's Brief at 10.    While acknowledging that the Kellys, at times throughout the years, retained other counsel, he maintains that he:

> alone—prepared and filed substantially all pleadings; researched and wrote all briefs and legal arguments; with the exception of the Receiver's deposition taken by co-counsel, John P. Vetica, Jr., conducted all depositions and other discovery; communicated with Range Resources and other third parties; and made the many [c]ourt appearances necessitated by Vennares' litigation strategy.

Appellant's Brief at 10.    Appellant contends that the Kellys asserted that their serious financial problems prevented them from paying him as legal services were rendered.[2]   In fact, Appellant asserts that the Kellys stipulated in the trial court that "(1) they do not have money, or sources of money, other than the money they will receive from settlement of the Kelly-Vennare Litigation, to pay [Appellant's] legal fee; and (2) a substantial portion of the settlement moneys to be paid [to the] Kellys will be used to pay taxes, [other attorneys'] legal fees and other obligations unrelated to [Appellant's] legal fee."   Appellant's Brief at 9.

The trial court denied Appellant's imposition of a charging lien on December 9, 2014, and Appellant filed a notice of appeal on December 17,

---

[2]  Margaret Kelly testified that they were having severe financial difficulties in 2010–2012.  Kelly Deposition, 10/13/14, at 45–46.  The trial court stated that those financial difficulties arose in 2008–2010.  Trial Court Opinion, 12/9/14, at 8–9.  Regardless of when the financial strain began, Appellant also represented the Kellys in their defense of execution proceedings by a small business lender and PNC Bank, in addition to the Paradise Hills litigation.  Kelly Deposition, 10/13/14, at 47.

2014. The trial court did not order the filing of a Pa.R.A.P. 1925(b) statement, and none was filed.

Appellant raises the following issues for our review:

1. Did the Trial Court disregard and misapply the *Recht* requirement of an agreement that an attorney look to the fund for compensation?

2. Did the Trial Court disregard quantum meruit principles, and their application to an Attorney's Charging Lien?

3. Did the Trial Court disregard uncontroverted evidence of Kellys' agreement to compensate Jeselnik from the fund?

4. Did the Trial Court disregard law and evidence in finding that there was no fee agreement between the parties?

Appellant's Brief at 7. Issues one, three, and four are inter-related, and we address them together initially.

"The right of an attorney to a *charging* lien upon a fund in court or otherwise applicable for distribution on equitable principles, which his services primarily aided in producing and to which, by agreement with his client, he is to look for compensation, has long been recognized . . . ." ***Brandywine Sav. & Loan Ass'n v. Redevelopment Auth. of Chester Cnty.***, 514 A.2d 673, 674 (Pa. Cmwlth. 1986) (quoting ***Harris's Appeal***, 186 A. 92, 94–95 (Pa. 1936))(emphasis in original).

As a matter of law, Pennsylvania courts recognize the right of a lawyer to an attorney's lien. Pennsylvania law recognizes two kinds of attorneys' liens: a charging lien and a retaining lien. Charging liens are divided into two sub-categories: equitable charging liens and legal charging liens. An equitable charging lien gives a lawyer a right to be paid out of a fund in the control or possession of the court, which fund resulted from the skill and

labor of the lawyer. Such payment may be applied only to the services provided in a particular case. A legal charging lien applies to funds of a client in the lawyer's possession which may be applied to all outstanding debts of the client owed to the lawyer. A retaining lien permits a lawyer to retain money, papers or other property in the lawyer's possession to secure payment of costs and fees from the client.

Ethical Considerations in Attorneys' Liens, PA Eth. Op. 2006-300 (PBA), 2006 WL 4590880, at 1 (footnotes omitted).

Appellant's issues relate to the trial court's exercise of its equitable powers, and therefore, we will not disturb the trial court's denial of Appellant's statement of claim absent a misapplication of the law or a clear abuse of discretion by the trial court. *Boatin v. Miller*, 955 A.2d 424, 427 (Pa. Super. 2007); *see also In re Estate of Cherwinski*, 856 A.2d 165, 167 (Pa. Super. 2004). An abuse of discretion exists where the trial court's determination overrides or misapplies the law, its judgment is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. *Majczyk v. Oesch*, 789 A.2d 717, 720 (Pa. Super. 2001). If a decision is based on "findings which are without factual support in the record, however, the reviewing court will not hesitate to reverse." *Lilly v. Markvan*, 763 A.2d 370, 372 (Pa. 2000) (citing *Bortz v. Noon*, 729 A.2d 555, 559 (Pa. 1999)).

The trial court initially stated that the Kellys acknowledged and agreed that Appellant would be compensated for his services and that payment would come from the portion of the assets of Paradise Hills ultimately awarded to the Kellys as a result of Appellant's efforts in the litigation. Trial

Court Opinion, 12/9/14, at 7. The trial court denied Appellant's request, however, because it concluded that there was never an express fee agreement between Appellant and the Kellys.[3] *Id*. at 13.

The trial court explained that when Appellant learned in 2006 that the Kellys were considering the purchase of a horse farm with the Vennares, he assisted the Kellys on a *pro bono* basis with regard to the formation of the entity, which was Paradise Hills, that would purchase the horse farm. Trial Court Opinion, 12/9/14, at 7. Thereafter, Paradise Hills was formed, the Kellys and the Vennares executed an operating agreement, and Paradise Hills purchased the horse farm. *Id*. The trial court stated that Appellant and the Kellys recognized that the nature of Appellant's representation would no longer be *pro bono*, and in December 2006, Margaret Kelly ("Margaret"), sent an email to Appellant stating that she wanted to compensate him for his services. *Id*. at 8. The trial court maintained that Appellant "failed to follow up with a proposed written fee agreement." *Id*.

The trial court referenced a number of emails in the record and ultimately found that because there was never an express fee agreement

_____

[3] The trial court appears to have based this conclusion on its review of deposition transcripts and attached exhibits. *See* Trial Court Opinion, 12/9/14. Furthermore, it apparently considered only whether there was an express **written** fee agreement. *Id.* at 13 n.4. ("Because the parties never entered into an agreement, I need not decide whether a court will consider the claim of an oral contingent fee agreement. See Rule 1.5 (c) of the Rules of Professional Conduct.").

between the Kellys and Appellant, Appellant had not met the requirements for the imposition of a charging lien. In the absence of any express fee agreement, the trial court did not consider whether Appellant met the other requirements for imposing a charging lien. Trial Court Opinion, 12/9/14, at 13.

*Recht v. Urban Development Authority of Clairton*, 168 A.2d 134 (Pa. 1961), is the seminal case discussing the requirements of an attorney's charging lien, while *McKelvy's and Sterrett's Appeals*, 108 Pa. 615 (1885), is the landmark decision on the subject. In *Recht*, our Supreme Court summarized the five conditions which must be met before a charging lien will be recognized and applied, as follows:

> [B]efore a charging lien will be recognized and applied, it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised, and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien.

*Recht*, 168 A.2d at 138–139; *see also Shenango Systems Solutions, Inc. v. Micros-Systems, Inc.*, 887 A.2d 772, 774 (Pa. Super 2005). The imposition of a charging lien is based upon the interest of the courts "in protecting attorneys, as its own officers," and in assuring that a party "not run away with the fruits [of a lawsuit] without satisfying the legal demands

of the attorney by whose industry those fruits were obtained." ***Johnson v. Stein***, 385 A.2d 514 (Pa. Super. 1978) (quoting ***Harris's Appeal***, 186 A. at 95).

Appellant admits there was not "an expressed written agreement" signed by Appellant and the Kellys. Appellant's Deposition, 9/17/14, at 19–20; Appellant's Brief at 11. Rather, he maintains that there was an agreement "confirmed in e-mail communications." Appellant's Deposition, 9/17/14, at 20. He asserts that the trial court's sole rationale for denying the charging lien was the absence of an express fee agreement between Appellant and the Kellys. Appellant contends that an express fee agreement is not a requirement of ***Recht***, and therefore, it is irrelevant to a proper analysis of the Kellys' agreement to compensate Appellant from the fund created by the Paradise Hills litigation. Appellant maintains that the trial court imposed a wholly irrelevant standard in analyzing only the existence or absence of a signed express fee agreement, and it erred in failing to evaluate all five conditions set forth in ***Recht***. Appellant's Brief at 18, 20, 22. We agree.

Appellant contends that the trial court's factual analysis, relating only to whether there was an express fee agreement, was irrelevant and misplaced because there was no consideration of any fact relating to the Kellys' agreement that Appellant would "look to the fund" for his compensation. Appellant's Brief at 28. He suggests that the Kellys

undeniably recognized their obligation to compensate him, and they agreed to pay him from the litigation fund. In support, Appellant cites to emails and testimony at Margaret Kelly's deposition. *Id*. at 29–32.

The Kellys respond that the record is devoid of any evidence that they agreed to pay Appellant from any particular source or fund. Rather, they maintain there were discussions and "general expressions of a desire to pay [Appellant] *something*." The Kellys' Brief at 18 (emphasis in original). They aver that there was never an agreement as to how the fees would be paid or the source of their payment.

The Kellys rely on ***Feingold v. Pucello***, 654 A.2d 1093 (Pa. Super. 1995),[4] claiming it stands for the proposition that "Pennsylvania courts will no longer award fees in equity where there is no written fee agreement." The Kellys' Brief at 30. In that case, the defendant was involved in a motor vehicle accident on February 2, 1979. A mutual friend referred Attorney

---

[4] ***Feingold*** is a plurality opinion. A plurality opinion is not binding precedent. ***Shinal v. Toms***, 122 A.3d 1066, 1076 (Pa. Super. 2015). The ***Feingold*** panel opinion was not joined by either of the other two judges without reservation; both judges concurred in the result, and one of the two also filed a concurring opinion suggesting that Mr. Feingold failed to make out a claim in quasi-contract that would entitle him to relief. As we reiterated in ***MacPherson v. Magee Memorial Hosp. for Convalescence***, 2015 PA Super 248 (Pa. Super. Ct. Nov. 25, 2015), "[O]ur Supreme Court has explained: 'While the ultimate order of a plurality opinion; *i.e.* an affirmance or reversal, is binding on the parties in that particular case, **legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority**.'" *Id*. at *11 (emphasis in original) (quoting ***Shinal***, 122 A.3d at 1076) (citing ***In Interest of O.A.***, 717 A.2d 490, 495–96 n.4 (Pa. 1998)).

Feingold to the defendant, and the attorney telephoned the defendant that evening. The next day, Mr. Feingold arranged a doctor's appointment for the defendant, and the two men discussed Mr. Feingold's legal representation of the defendant via telephone. Fee arrangements were not discussed. Over the course of the ensuing month, Mr. Feingold inspected the accident site, took photographs, and obtained an admission of liability from the other driver. A few weeks later, toward the end of February, Mr. Feingold mailed the defendant a formal contingency fee agreement consisting of a fifty–fifty split of the recovery after costs. The defendant "balked at the high fee, and found other counsel," and told Mr. Feingold to keep any photographs, reports, and admissions. *Feingold*, 654 A.2d at 1094. Mr. Feingold never forwarded the file. One year later, Mr. Feingold sued the defendant in *quantum meruit*. A board of arbitrators found in favor of the defendant. Mr. Feingold appealed, and following a bench trial, the trial court found "that while Feingold might have had a *quantum meruit* claim if [the defendant] retained him and then fired him midway through the case, here the parties never even entered into an attorney-client relationship." *Id*. Thus, the trial court found for the defendant, and Mr. Feingold appealed to this Court.

On appeal, Mr. Feingold argued that the defendant orally agreed to the representation; thus, despite the absence of a signed written fee agreement, he asserted that he was entitled to be paid for the work he did. This Court

noted therein that *quantum meruit* is an equitable remedy and determined that Attorney Feingold had unclean hands for failing to secure a written fee agreement, which is a violation of the Rules of Professional Responsibility, and counsel proceeded at his own risk.  In *dicta*, this Court opined that Mr. Feingold's claim would more properly lie against the defendant's attorney, "who testified that he still could have won the case without Feingold's preliminary work."  **Feingold**, 654 A.2d at 1095.  **Compare Meyer, Darragh, Buckler, Bebenek, and Eck v. Law Firm of Malone Middleman**, 95 A.3d 893 (Pa. Super. 2014) (claim for *quantum meruit* cannot be maintained by a former attorney against a subsequent attorney), *petition for allowance of appeal granted*, 113 A.3d 277 (Pa. April 13, 2015). This Court also labeled Mr. Feingold's proposed fee as "breathtakingly high" that struck the trial court as "unethical."  **Feingold**, 654 A.2d at 1094.

We believe **Feingold** is distinguishable from the instant case, as well as not being binding precedent.  It was clear in **Feingold** that the defendant rejected outright any representation by Mr. Feingold; indeed, the Court found that there was never an attorney-client relationship.  Moreover, therein, Mr. Feingold undertook it upon himself to investigate the defendant's claim for a period of three to four weeks, at which time the defendant made it clear that he was not interested in Mr. Feingold's representation.  Conversely, herein, the Kellys relied upon Appellant's representation for **seven years**, all the while assuring him that he would be

paid. Further, regarding **Feingold's** commentary on oral contingency agreements, we note that "where the existence of a contract for a [contingent fee] is established, and the testimony establishes that it is reasonable, it will be upheld, even though verbal." *Silverstein v. Hornick*, 153 A.2d 734, 737 (Pa. 1954); *see also Novinger v. E.I. Du Pont de Nemours & Co.*, 809 F.2d 212, 218 (3d Cir. 1987) (stating "although Pennsylvania Civil Procedure Rule 202[5] requires that contingent fee agreements be in writing, the absence of such a writing does not make oral contingent fee agreements unenforceable.").

In the case *sub judice*, we agree with Appellant that the certified record is replete with promises by the Kellys that they would compensate Appellant from the money they received upon the conclusion of the Paradise Hills litigation. Consistent with the Kellys' response, the record also reveals repeated requests by the Kellys for a formal written fee agreement. At Margaret's deposition on October 13, 2014, Appellant produced multiple emails between Appellant and Margaret that reflect on the issue. As far back as December 4, 2006, Margaret sent Appellant an email apologizing that "this [matter] has turned into what it has—but know that Carl and I want to compensate you for your legal advi[c]e." Kelly Deposition,

---

[5] Pa.R.C.P. 202 was rescinded on April 4, 1990, effective July 1, 1990. The 1990 explanatory comment stated that contingent fee agreements "are regulated by several provisions of the new Rules of Professional Conduct." *Id*., cmt. *See*, *e.g.*, Pa.R.P.C. 1.5(c) (contingent fee shall be in writing).

10/13/14, at 10–11; Exh. 4. On February 18, 2009, an exchange of emails between Appellant and Margaret contained Appellant's assurance, "I agree that we must talk about fees, bases, structure, timing, *etc*. We will do so, without fail, in early March. . . . I have every confidence they will come, if not from the V[ennares], from [Paradise Hills] assets upon liquidation or division." Kelly Deposition, 10/13/14, at 13; Exh. 4. Margaret replied, *inter alia*, "You, of course, are the right person for representing us." **Id**. A February 27, 2009 email from Margaret to Appellant posits, "Also, we do want to get fees squared away." **Id**. at 16.

While the Paradise Hills litigation was proceeding, Appellant also represented the Kellys regarding their creditors. Appellant negotiated with the creditors and prepared a financial statement dated August 6, 2010. Trial Court Opinion, 12/9/14, at 9; Kelly Deposition, 10/13/14, at 100; Exh. 4. Attachment 1 to the financial statement states as follows:

> In the litigation related to Paradise Hills, L.L.C., Paradise Hills and Margaret and Carlton Kelly are being represented by attorney, Tony Jeselnik ("Jeselnik"), on contingency basis. The case is Kelly and Paradise Hills, L.L.C. v. Vennare and Horse'N Soul, Inc., at G.D. No. 08-11997 . . . . Jeselnik will receive 40 percent of the value of Paradise Hills realized by Kellys.

Kelly Deposition, 10/13/14, at 101; Exh. 4. Margaret initially claimed uncertainty whether she reviewed the statement before it was sent, **id**. at 101, but she admitted that she signed the financial statement. **Id**. at 102. That document contained an "Offer in Compromise" which made a further reference to Appellant's fee, as follows: "In the event that the Paradise Hills

litigation concludes successfully, *i.e.*, the Paradise Hills property and gas rights are determined to have value for the Kellys, any money representing Kellys' net interest in the value of Paradise Hills, subject to taxes and Jeselnik's percentage contingency, will be paid . . . ." Kelly Deposition, 10/13/14, at 105; Exh. 4. Margaret then admitted that she was "aware of that information being provided to the bank when [she] signed the Offer of Compromise." *Id*. at 105–106.

In an email from Margaret to Appellant, also dated August 6, 2010, Margaret stated the following: "Re: attorney fees. I would like to negotiate your fees to 35% up to $400,000, then 25% up to $500,000 or perhaps there is a percentage in perpetuity." Kelly Deposition, 10/13/14, at 19; Exh. GG. Margaret testified that the fees would be a percentage "of whatever recovery there was of Paradise Hills." *Id*. at 19. At Margaret's deposition, when Appellant asked, "[T]ell me please, what this 35 percent is of?", Margaret explained, "It would be net recovery. So, if we recovered $500,000, I would deduct all the expenses that I incurred through the case and investment in Paradise Hills, and any expenses." *Id*. at 21. Margaret testified that while the financial document indicated Appellant's forty percent fee, she denied ever agreeing, other than signing the document, to such a fee. *Id*. at 103. Thus, she admitted seeing and signing the document referencing the forty percent fee, but denied ever agreeing to that percentage. *Id*.

In an August 27, 2013 email, Margaret thanked Appellant for all of his work and reminded him that "we need a formal agreement with respect to your fee." Kelly Deposition, 10/13/14, at Exh G. Appellant responded the next day that he would send a proposed fee schedule "in the next couple of days." *Id*. at Exh H. Emails between the parties over the next couple of months referred, *inter alia*, both to the Kellys' acknowledgment that they owed money to Appellant and their requests and frustration that a formal written agreement was not forthcoming. *Id*. at Exh K, L, M. Appellant presented an email from Margaret to Appellant dated December 1, 2013. Kelly Deposition, 10/13/14, at 27; Exh. 4. Margaret acknowledged that the Kellys' and Appellant's relationship was one of "attorney-client." *Id*. at 28, 39. Margaret admitted that Appellant continued to represent the Kellys but was not paid for his services. *Id*. at 47. Also in the December 1st email, Margaret wrote to Appellant, "I realize that we owe you an amount of money, **to be determined by the outcome of this case.** At this point, Carl and I cannot possibly calculate the amount." *Id*. (emphasis added). At the deposition, Appellant inquired, "The outcome of the case to which you refer here, is . . . the Paradise Hills litigation?" Margaret responded, "Yes." *Id*. at 48.

On December 4, 2013, Margaret sent Appellant an email stating, *inter alia*, "[Y]ou have done a lot of work and we appreciate that. **You will be compensated**." Kelly Deposition, 10/13/14, at 64, 71; Exh. O. Margaret

admitted that "we would pay you [Appellant] based on the recovery of Paradise Hills." *Id*. at 71. On December 9, 2013, Margaret wrote to Appellant, stating, *inter alia*, "Again, we owe you a fee, to be determined by the outcome of the case." *Id*. at 72. Margaret admitted at her deposition that the case reference "is the same Paradise Hills case that we've been talking about." *Id*. at 72.

On January 16, 2014, via email, Margaret advised, "Carl and I will compensate you." Kelly Deposition, 10/13/14, at 724; Exh. 4. On January 29, 2014, Margaret stated in an email, "You have put a hell of a lot of work into this case and your briefs against Dick's ridiculous claims have been very well written." *Id*. at 74–75. She added, "We still need to come to an agreement as to your compensation. As I have said earlier, your proposal of 40% of everything, forever, and without deduction is unacceptable. *Id*.

Eventually, on February 2, 2014, Margaret instructed Appellant to "withdraw your appearance in this case immediately . . . ." Kelly Deposition, 10/13/14, at 77; Exh. 4. In the same email, she assured Appellant, "We will compensate you for your time as a percentage of what we receive up to a maximum dollar amount." *Id*.

We note the following exchange between Margaret and Appellant:

Appellant: Is it fair to characterize the [Paradise Hills] litigation as intense and constant?

Margaret: Intense. . . .

> Appellant: You had described, Meg, receiving advice from Pam Leyden, Donald Lund, John Vetica, and now Louise Vuono Schrage. Were there any other attorneys besides those three persons and me who have you advice [sic] in the course of this litigation?
>
> Margaret: No.
>
> Appellant: You paid all those attorneys for their time and consultation?
>
> Margaret: Yes.
>
> * * *
>
> Appellant: Is it fair to say, given the docket entries and this litigation, in retrospect, that I was the one that was doing the bulk of the work, doing the actual litigation on your behalf and Carl's behalf?
>
> Margaret: Yes.

Kelly Deposition, 10/13/14, at 130–131, 134.

The record undeniably reflects an attorney-client relationship between Appellant and the Kellys. Without doubt, there was an agreement by the Kellys to pay Appellant. In light of the myriad emails confirming it, in combination with the financial documents the Kellys signed, the Kellys obviously agreed to pay Appellant from the settlement of the Paradise Hills litigation, even though the parties did not agree on the percentage.

Moreover, the evidentiary value of the financial statement documents containing two references to Appellant's forty percent fee cannot be dismissed, even though we do not find that the parties agreed to the specific fee. The trial court opined that there is not credible evidence to support a

finding that the contents of the attachment were approved by the Kellys. Trial Court Opinion, 12/9/14, at 12. The record does not support that conclusion. Margaret Kelly signed the documents and admitted that the documents stated Appellant's potential recovery of forty percent. Kelly Deposition, 10/13/14, at 105–106. While she thereafter sent Appellant the August 6, 2010 email attempting to negotiate down the percentage, that fact does not negate support for her prior approval of the document, as evidenced by her signature on the financial attachment and her admission at her deposition that she "apparently" was aware of the representation that Appellant's fee was forty percent when she signed the documents. *Id*. at 105. At the same time, the documents as evidence of the existence of an agreed-upon fee percentage was called into question by Margaret's follow-up email suggesting a lower, graduated fee percentage.

In light of this record, particularly the length of time Appellant represented the Kellys at their request and acquiescence, and the procedural posture of this case, we are loathe to agree with the trial court's conclusion that the lack of a formal written fee agreement precludes Appellant's assertion of a charging lien and eventual recovery in *quantum meruit*. Moreover, as noted *supra*, **Feingold**, cited by the Kellys, is inapposite, where Attorney Feingold admitted there was no agreement by the client for Feingold to even represent his interest, the attorney undertook responsibility on his own to investigate the case over a mere three-week period without

such attorney-client relationship, the client obtained other counsel upon learning of Feingold's requested fifty-percent contingent fee, Feingold never forwarded the file, and Feingold sued in *quantum meruit* one year later. **Feingold**, 654 A.2d 1093.

Appellant's provision of legal services to the Kellys for seven years without payment despite their repeated assurances that he would be paid **upon** settlement, and **from** the settlement of the Paradise Hills litigation, is profound evidence. The Kellys' actions created and sustained a client relationship with Appellant and manifested the Kellys' intent to accept Appellant's services and to compensate him for those services from the settlement fund. Their signature on the financial documents attested to an agreement that Appellant would be compensated from the settlement fund. The record thus demonstrates that Appellant and the Kellys agreed that Appellant would look to the Paradise Hills settlement for his fee, and Appellant's continued representation over the seven-year period at the Kellys' request justified this claim. We recognize that at the same time, the Kellys repeatedly requested Appellant to provide a formal written fee agreement, which he shamefully failed to provide. However, this is an issue for the court to consider when addressing the remaining **Recht** factors.

We proceed to consider Appellant's second issue. Because the Kellys discharged Appellant before the Paradise Hills litigation was settled,

Appellant's exclusive right to compensation is implied in the law and is governed by *quantum meruit* principles.

> "[U]nder Pennsylvania law, a client has the absolute right to terminate an attorney-client relationship, regardless of any contractual arrangement between the two parties." **Kenis v. Perini Corp.**, 682 A.2d 845, 849 (Pa. Super. 1996); **see** Pa.R.P.C. 1.16 cmt. 4 ("A client has a right to [terminate] a lawyer at any time, with or without cause, subject to liability for payment for the lawyer's services."). Upon a client's termination of an attorney-client relationship prior to the occurrence of the contingency set forth in a fee agreement, the client is not relieved of his or her obligation to compensate the attorney for services rendered until the time of termination. In such situations, the terminated attorney generally has a claim in *quantum meruit* to recover his fees. **See** [**Hiscott & Robinson v. King**], 626 A.2d [1235] at 1237 [(Pa. Super. 1993) (noting the contingency contemplated in the agreement was not satisfied). "*Quantum meruit* is an equitable remedy, which is defined as 'as much as deserved' and measures compensation under an implied contract to pay compensation as reasonable value of services rendered." **Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, PC**, 95 A.3d 893, 896 (Pa. Super. 2014) (citation omitted), appeal granted, 113 A.3d 277 (Pa. 2015).

**Angino & Rovner v. Lessin**, ____ A.3d at ____, 2016 PA Super 2 at *4 (slip op. at 10). "A client may terminate his relation with an attorney at any time, notwithstanding a contract for fees, but if he does so, thus making performance of the contract impossible, the attorney is not deprived of his right to recover on a *quantum meruit* a proper amount for the services which he has rendered." **Mager v. Bultena**, 797 A.2d 948, 956 (Pa. Super. 2002) (quoting **Sundheim v. Beaver Cty. Bldg. & Loan Ass'n**, 14 A.2d 349, 351 (1940)); **accord Dorsett v. Hughes**, 509 A.2d 369, 371 (Pa. Super. 1986).

The equitable doctrine of *quantum meruit* involves a class of obligations imposed by law, regardless of the intention or assent of the parties for reasons dictated by justice and is based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby. To avoid such unjust enrichment, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even absent a specific contract therefor.

***Bednar v. Marino***, 646 A.2d 573, 578 (1994); ***see also Ragnar Benson, Inc. v. Bethel Mart Associates***, 454 A.2d 599, 603 (Pa. Super. 1982) ("*Quantum meruit* is a remedy based in payment for services rendered and prevention of unjust enrichment; the 'contract' is one 'implied in law' and not an actual contract at all.").

"It is well established that a 'court of equity has jurisdiction and, in furtherance of justice, will afford relief it the statutory or legal remedy is inadequate, or it equitable relief is necessary [as here] to prevent irreparable harm." ***Vautar v. First National Bank of PA***, ___ A.3d ___, 2016 PA Super 5 (Pa. Super. filed January 6, 2016) (*en banc*) (slip op. at 10). Clearly, Appellant cannot recover on a contractual basis in this case. ***Angino & Rovner***, ___ A.3d ___, 2016 PA Super 2. It follows that he cannot rely upon an express fee agreement to establish the amount of the charging lien, which is designed to protect his fee. Appellant's claim is in *quantum meruit*, which is the only basis upon which Appellant can recover. ***Id***. Therefore, we agree with Appellant that the trial court's ruling herein disregards Appellant's implied-in-law fee claim. Appellant's Brief at 25.

- 23 -

Thus, we harken back to the *Recht* factors that the trial court was compelled to consider. We have concluded that the lack of an express fee agreement does not preclude the imposition of a charging lien where an attorney is discharged. We agree with Appellant that having been terminated and effectively rescinded by Kellys' action, a fee agreement—whether express or implied—is of no effect and thus not determinative of his charging-lien claim. Appellant's Brief at 15. Given that the record establishes that the Kellys and Appellant entered into an attorney-client relationship and agreed that Appellant would look to the fund for his compensation, we thus remand to the trial court to consider the remaining *Recht* factors.

The order of December 9, 2014, is vacated; case remanded for proceedings consistent with this Memorandum. Jurisdiction is relinquished.

Judge Stabile Concurs in the Result.

Judge Ott files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/16/2016